This afternoon is 4-16-0-8-1-8, People v. Hinthorn, show for the appellant Gilbert Lenz. Are you here, sir? Is that pronounced correctly? Lenz. And for the appellee, Kathy Shepard. Mr. Lenz, you may proceed. Again, my name is Gilbert Lenz, and I'm here representing Christopher Hinthorn. As Your Honor's know, there are three subsequent issues before the court. And I'd like to address all three of those, starting with the reasonable doubt claim, and then moving to Argument 3, regarding other crimes evidenced, including his refusal to argue the suit. But of course, I'm happy to address these three important court concerns. Your Honor, as to the reasonable doubt question, the question before the court is whether the state's evidence was sufficient to support more than one conviction for the charged offender. And I'd like to start by knowing the contrast between the evidence after the first incident and evidence of whether there was more than one incident. As to the first incident, R.H. testified that it occurred when she was five years old in 2005. And she generally described that it was an act of penis-vagina contact, which is a qualifying contact for the charged offense. She also recalled several details from that incident. She recalled the pajamas that she was wearing. She recalled seeing blood on those pajamas. And she recalled smelling alcohol during the incident. And that stands in stark contrast to the state's evidence as to whether there was more than one incident. In fact, that evidence was insufficient to prove more than one conviction. And this is primarily true because of the vagueness of the remaining testimony about the nature of any subsequent incident. After R.H.'s detailed testimony of the first incident, the prosecutor asked her, I believe six times, whether, quote, this, unquote, happened again or whether this happened more than once. And R.H. agreed that it did and testified it happened more than once or three or four times. It was unclear, and it remains unclear from this testimony, whether, quote, this is the exact form of qualifying contact that meets the definition of the charged offense. And I think the prosecutor recognized at the trial and tried to get more specific on those counts. The prosecutor asked her whether it happened the same way again. And R.H. said, I don't remember. And the prosecutor asked her whether Mr. Minford used the same body parts in the subsequent incidents. And again, she said, I don't remember. So we're left, really, with the word this. And it's just as reasonable an interpretation for a 16-year-old in R.H.'s position to think that this meant some inappropriate sexual contact by her father. It does not prove beyond a reasonable doubt that that contact was the qualifying contact necessary to sustain a conviction. Well, jury, why couldn't a jury be permitted to so infer? And if there was ambiguity, why didn't the defense ask, what did you mean? Well, as to the first question. Two different questions. Yeah. So as to the first question, the jury, of course, we do defer to jury's findings, but only up to a point, obviously. Isn't the jury permissible to decide what the appropriate antecedent is? Well, that question was before the jury, and there's no question that they found Mr. Minford guilty on the multiple accounts. So your argument is the antecedent was different than the one the jury found, but there was no questioning about that or clarification sought, was there? Right. Well, so the defense, of course, was not under a burden to ask the argument. Well, but you're not under a burden at any point, but doesn't it reduce the value of the argument that, gee, she was confused and maybe didn't mean it when the clarification that could have cleared it up wasn't sought? Well, I think at this point, it was the state who tried to clear it up by asking multiple times whether the incident happened the same way. More than six times, whether this happened again, whether it happened the same way. R.H. agreed it happened again, but she also said, I don't remember when it got down to the exact, specific nature of the contact. And that, just simply regardless of the jury's findings, that it's simply insufficient evidence that requires reversal of two of the three cases. So the question is not whether Mr. Minford was properly found guilty of a very serious offense. He was. The question is whether there's enough evidence here to support multiple convictions when they're mandatory consecutive sentences. So, I think in this context, yeah, I think it is. On that point, you were just describing it. Page seven of the state's brief, state writes that, quote, each of those four times, close quote. So we're getting to that point that you're talking about. Defendant's body part always touched her, the victim's lower body part in the front, which was a private area on her body. Is that an accurate characterization of the testimony? I believe, in my reading of the record, was that she never, R.H. never testified that her father's, the same body part she described, as in the first incident, touched her in subsequent instances. She agreed multiple times that this happened again. The state did ask her each of those four times. That was after she testified it happened three or four times. But I don't believe that the record reflects that she agreed that that specific body part touched. She did identify that her specific body part, her own, was an issue. But she never, she said, I don't remember whether Mr. Minford used a different body part in subsequent instances. So I would take issue, some issue with that quote in the state's decision. I'm going to go to the discussion about the testimony of H.H. in the prior rape allegations. Would you agree that, from a woman's point of view, being beaten is different from being raped? Well, I, I think. They called for a yes or no question, answer, unless there's a problem. I'm sure the answer is yes. Okay. And would you agree that women might find being raped worse than being beaten? It's certainly possible, Your Honor. Okay. Well, the reason I ask this is because H.H. not only testified at trial ultimately, but she also, in her statements to the police that the defense knew about and successfully barred her from testifying in the case in chief, knew that she had said, I went along with all of this because I was afraid the defendant would beat me and rape me again. It's your position that it was improper and redirect to permit the state to bring out the rape me again language? Yes. Okay. Now, here's, here's the thing. Didn't the defense counsel, by his cross-examination, create essentially the following claim? H.H. is behind these false allegations, and she's claimed that the only reason she went along with what the defendant said is because she was afraid of being beaten again, but she said, oh, I would never do this. I'd have to be beaten with a leather belt or something of this effect. And didn't defense counsel, during cross-examination, impeach her to leave doubt in the jury's mind whether the fear of being beaten again would have been enough, in H.H.'s own words, to constitute, to overcome her unwillingness to engage in the activity she said she engaged in? That, that is, that is our understanding of the record as well. Okay. Well, then, why, let me put it this way. The defense counsel knew, when he conducted that cross-examination, that that's not the limit of what H.H. had said. He knew it because he had successfully barred her from testifying in direct examination about her fear of being raped. Why hadn't he opened the door to bring that out so as to avoid creating a false impression in the mind of the jury that he then took advantage of in his questioning and arguments that, oh, you don't, don't believe her, being beaten wasn't enough? Well, I believe the answer to that, Your Honor, is that the defense counsel's cross-examination of H.H. did not open the door because the jury heard ample evidence not just that H.H. feared being physically, physical violence from Mr. Hinckley, but she had other tremendous fears that drove her. No, I'm specifically, she said, you remember how I began this question, is being beaten the same as being raped? Could a woman view being raped as worse? She said, I was afraid of being beaten and raped again. And the jury heard nothing about that. No, but the jury, well, the jury did hear it. Only afterward, but you're suggesting that somehow without bringing that up direct, the jury, what, the jury knew about it or thought about it or what? No, what the jury heard was sufficient to explain H.H.'s state of mind because they heard more than her fear of physical violence. They heard that she feared arrest, she feared being reported to the police and feared being put in prison, and she feared, her tremendous fear of losing custody of her children. So being, the fear of being raped, did it matter? It may have been, it may have been relevant to her state of mind, but the question is whether that evidence can come in in this particular trial under the prejudicial probative balancing test. And the jury heard, you know, the state's allowed to put statements in context, of course, and that's why the state was allowed to elicit a lot of evidence about her fear of physical violence or fear of... Well, didn't the cross-examination intentionally create a false impression that the fear of beating, that was it? That was, as a forensic, to be more direct, let's assume she also said, he said he'd kill me if I didn't do it. I was afraid for my life, and for whatever reason, the defense of a motion in limine got that barred in the direct examination. You think that would be something that after, on cross-examination, the one that occurred here, the state should be permitted now to reopen, to go into that matter, so as to avoid the false impression that there was just fear of beating, and she said, oh, he's going to kill me, that's why I did it. Well, I think there's multiple points there, Your Honor. First, you know, there's no question the state was allowed to explain A.J.'s conduct, because everyone knew that the defense was going to call her credibility into question, especially on her literature report. So, the state presented three different, very compelling reasons to explain that literature report, and... But the worst, the most compelling, they weren't permitted to bring out because of its potential prejudicial impact, until the defense argued that, in effect, in question or in effect, that was all there was, the fear of the beatings. That was it. Isn't that what the defense was suggesting? Well, I don't think that took away from what the jury heard about her own group here. Isn't that what the defense was suggesting? Fear of beatings was it? That was your motivation for doing these terrible acts? That there was no other basis compelling her to do it? Well, the defense questioned her failure to report, and... Isn't that what the defense was suggesting? It may have been implicit in the one question, did she want to prosecute? That would work, implicit. But it was, but the jury heard, there was no, the defense counsel didn't do anything to challenge her, her testimony that she feared losing custody of her children. No, challenge that she's a liar, she made this all up, and fear of beatings wouldn't have been enough to do it. That was her suggestion. Why is this a suggestion? Well, and, and, and even, our position is that nothing that happened on cross-examination went beyond the scope of direct, but... No one's suggesting that. He opened the door to it, though, didn't he? By creating this false impression that there was nothing more than fear of beatings? Our, our position is that he did not because... Because what? Because the state was allowed to present ample evidence to explain AJ's conduct without getting into the highly... So her fear of being raped wasn't probative or pertinent? No, we're not saying it wasn't probative. The, the question in other crimes evidence cases, of course, is whether this very probative evidence is too prejudicial. And, again, where the state has ample opportunity to explain the situation without getting into, you know, with other evidence that isn't this highly prejudicial evidence, they're allowed to do that, and that's exactly what happened here. And they shouldn't have been allowed, just as Judge Foley and even Judge Bright said before trial, agreed, this was too prejudicial to come in, this evidence of prior rape allegations. Then why did he include the reference in this cross-examination in her comment to the investigators that I'd rather take a beating with a leather belt than molest my daughter? Well, of course, I, I, I don't know why counsel asked that question, but it, it was brought in... Okay, then let me answer it for you. Because he wanted to expressly create that impression that she was a liar. She's telling you, on the one hand, she'd rather be beaten than molest her daughter, but yet she's saying that this fear of being beaten is what caused her to molest her daughter, so, therefore, she must be lying. Isn't that what happened? Hasn't Judge Theon mistaken exactly the impression for the jury and why counsel did it? That, that was the, that was the point of the question, to attack... Exactly. Is it fair, is it proper, is it appropriate for a defense counsel to win a motion in limine, specifically exclude a piece of evidence, and then, by using that as a shield, create an impression he knows is not true because there's more to the story, it's just that he's been able to keep it out. Is that appropriate? And isn't that, in fact, exactly what curative admissibility is about? Well, that is exactly what curative admissibility is about. However, even if all of this is true about counsel's motivation, the question is still before the trial court and this court whether that evidence was still too prejudicial to come in. So the trial court concluded not. This is a question of abuse of discretion. We're still supposed to conclude that it was too prejudicial to come in and the jury should be left with the intentionally false impression that the defense counsel created by his cross-examination that he knew was false because he had successfully kept out this probative evidence in his motion limine. Well, I don't know what was in the trial counsel's mind, so I don't want to ascribe intent to that. Well, I am, and I don't see how it could mean anything else. And we should conclude that the trial court's viewing this as such amounts to abuse of discretion, meaning no reasonable judge in the position of the trial judge hearing all this could have possibly decided to let this evidence in. That's your argument? Correct. Because of the highly prejudicial nature of that evidence, even if the most sinister motive is to describe the trial counsel, there's still a question of whether this evidence should come in because of the highly prejudicial nature. And I would point out two things to the court if I may. One is that HH's state of mind, so when this evidence was initially addressed before trial, it was for Mr. Ginsburg's propensity. It was the most probative for that question. And yet both Judge Foley and even Judge Freitag agreed that it couldn't come in because it was too prejudicial on that question. Now, in the middle of trial, regardless of what trial counsel did, the question is whether it can come in or not for Mr. Ginsburg's propensity, for which it was most probative, but for a more tangential issue of the state of mind of the state's witness. And so it's even less probative of that, but it's prejudiced still just as extreme. What it's probative of is to remove a correct and unfavorable inference which counsel knows is not true. Correct? That security of admissibility is held up. That is what that question is about. I don't know if trial counsel knew what trial counsel knew, but I do know that both of them agreed. Do you understand how many years of trial court experience we have here? About 40, to make it easy for you. When he specifically hones in on that portion of her statement and specifically references the, I'd rather take a beating with a leather belt than molest my daughter, you're telling me you can't tell what the trial counsel was intending? No, of course I don't know what was in trial counsel's mind, but I do know that nothing changes the fact of what the question is, what the legal question is, whether it is that even with the most sinister movement could come in. Aren't these trials supposed to be truth-seeking processes where we're supposed to present the jury with the truth as best we can, and particularly to overcome false impressions that have been intentionally created? Well, that would take me back to an answer I started a moment ago, Your Honor, which is about the relevance of this evidence. It was brought in for H.H.'s state of mind, and her state of mind was actually only relevant, there were multiple accounts here, it was only relevant to one particular account, so the accounts that involved just Mr. Hinton and H.H. H.H.'s state of mind had nothing to do with those, so that only further decreases the proven value of any evidence about her state of mind. The victim was a young victim. The entire theory of the defense was H.H. is the liar, and she created this whole theory, and here's further evidence, ladies and gentlemen, in case you missed it of what a liar she is. That's what's going on in this case, isn't it? Well, they certainly were attacking H.H.'s credibility, that was part of the defense, yes, but H.H.'s state of mind, the reason the primitive value of this evidence was reduced was because her state of mind was really only relevant to this one particular account, and he stands out convicted of multiple accounts where H.H.'s state of mind had nothing to do with it. Counselor, your time is up. I apologize, I've taken up much of your time. You'll have an opportunity to address this again in rebuttal, and if you need additional time in rebuttal, I'll let you have it if there were some other points you wanted to discuss, because I asked too many questions you weren't given an opportunity to. Well, thank you, Your Honor. Okay. Ms. Shepard? May it please the Court? Counsel? I'm not quite sure what to add to the issue that was last discussed, Your Honor, which covered all the points, and then some, that we tried to address in our brief. I just would mention a couple things, and it's not only the defense counsel's intent, but, of course, what the effect is on the jury, and the effect of the defense counsel's process of examination of H.H. was to leave an unfair interest that was prejudicial to the state, and that gets this testimony in under the document, which says, Invisibility, Removal of Weakness. I should mention, we're talking about both H.H.'s testimony on the direct and also Detective Heinlein's testimony that the defendant admitted in his interview with Detective Heinlein that he sexually assaulted H.H. multiple times. I had said that, in my brief, that all of the evidence was admissible under the doctrine of juridical admissibility, but in looking at how that doctrine is applied, it looks like it only allows further testimony on redirect, which would, of course, apply to H.H., but not Detective Heinlein. So then we look at, it gets in under Rule 106, the Doctrine of Compliance, and it's on the Crime Debate List. It's highly probative opposing counsel saying that it was only relevant to, it was actually two counts, but one offense, the offense in which both H.H. and the defendant were involved, they had to prove, had the burden of proof on that offense. So to say that it's only relevant to one count is irrelevant to whether or not it should have been admitted. And it's sort of prejudiced. It seems that opposing counsel is conceding both that this evidence was highly relevant and also that it was admissible, but he's arguing that it's prejudicial. And you can point out, as we did in our brief, that it was very limited. The testimony that was admitted was very limited. The jury was instructed before each witness testified and, again, before the jury returned to deliberate, or so to I.P.I. Grinnell and what not to look. And Heinlein's testimony was very valuable in that it prevented a mini-trial on whether or not the defendant admitted his conduct because he admitted it in his own view. And, of course, the jury acquitted the defendant of counts three and four, and so they apparently rejected H.H.'s testimony. So that further diminishes any prejudice or shows that any error would have been harmless. And it wasn't emphasized in the closing argument. The defendant argued that it was. The prosecutor will refer to it in the same sentence. So as to that issue, I guess I want to point out, Justice Harris, you asked about what we said in our brief about what R.H. said about the type of contact. And I had cited to page 113 of her testimony. And at that page, the prosecutor asked R.H., each of those four times, did it happen the same way that you described? And she said, I don't remember. And then the prosecutor said, was there ever another body part of his that touched you? I don't remember. Was there ever another body part of yours that he touched? I don't think so. But then the prosecutor asked, so was it always the body part, your lower body part in the front? She answered, yeah. Is that a primary on your body? Yeah. So that describes the kind of contact. And she also talked about this happening the multiple times, more than two, probably three or four. And she described, even though she didn't name the body parts, the defendant of the part being covered up by her underwear going into her parking lot. Let me ask this. It seemed to me Judge Freitag was very careful with regard to handling all this evidence. On direct examination after hearing the cross, he let her testify about her fear of being raped. She had also told this to Officer Heinlein. And is my understanding correct that when the state wanted to call Officer Heinlein to corroborate this, the judge did not permit the state to do so? I'm not recalling that. When the state wanted to— Did he only get to call Heinlein to indicate that the defendant himself had acknowledged that he had raped her the previous time? I don't recall that. The other thing is— Let me ask this first. In H.H.'s testimony during a redirect examination, when she talked about how fear of being raped again was a motivating factor in why she did what she did, did she—was she asked and did she testify at that time that she had spoken to Heinlein about that? She had said that in her interviews with the police? Let's see. Well, I'll put it in my brief. I should be looking it up while I'm speaking to this testimony. I don't think that she said that. But one of the arguments I should— Because I'm wondering if that was something that Judge Freitag, to avoid a disbalancing test, kept out. But I think, frankly, if I were a trial judge, I think if I'm going to look at it, I think that would be what H.H. said. I would be probative as well to demonstrate this isn't some late inscribed notion of her, that this is, I think, what likely fit the prior consistent statement standard of— This is not something that I'm just saying now in redirect. I said it earlier in report to the police. But that wasn't—there was no testimony to that effect? Okay. I've got my quote of what she said. And she said, when John Heinlein talked to you about people who would understand that he forced you, had you and Detective Heinlein been talking about the entire spectrum of your marriage, and yes, that's the reference to Detective Heinlein. And that was it? Okay. Yes. As I wanted to just bring up, I had argued in the brief that this court is very limited in reviewing this issue. I mean, we look at what was represented at trial, which Hensley also never disputed, and the prosecutor described what this interview said. There are two interviews that H.H. participated in. One, the first one, was at the CAC, and all of this testimony that opened the door, that cross-examination, the defense counsel was asking about the CAC interview. That is not in the record. It was discovered that that interview was recorded shortly before trial. And it exists, but it's not in the record. So the one that's in the record is the police interview. So this court isn't in a position to dispute that what representations were at trial as to the door and what this testimony was and its relevance. So unless the court has any further questions, please simply ask. Thank you. I see that.  Mr. Lenz, any rebuttals, sir? And as I mentioned again, if you want to go at the end, just a little rebuttal, I'd give you the opportunity. Okay, thank you. Just very quickly on the reasonable doubt claim. We agree with counsel's reading of the transcript, and I think that shows why the evidence on one of the rules supporting most of the convictions here was insufficient, because while R.H. did identify her own body part issue, she very clearly said, I don't remember the body part of Mr. Hinthorn that was involved, and I don't remember whether it happened both the same way. So I think that answers the question. And this court should reverse two of Mr. Hinthorn's convictions. I would just add one point on that argument for you to draw your attention to. In the alternative, because there's also some vague testimony about when these multiple incidents occurred, we know the first one was 2005. The last one was 2007 or 2008. There's no specificity as to time of a third incident, and so this court could also draw an alternative line between the second conviction and the third conviction, because the testimony about the third incident would be more vague, and so this court should reverse these one or the other convictions in that case. Returning to the other crime evidence issue, Your Honor, the parties agree, you know, the question here is what the effect was on the jury of everything that happened. And when we're looking at the prejudice versus probative value balance here, I would point the court as well to Detective Hyland's testimony that the state was allowed to present as part of an explanation of H.H.'s state of mind. And what Detective Hyland testified, even though it was only one question, was an incredibly prejudicial question, which was that Mr. Hinthorn confessed to me to committing multiple forcible rapes. And the question before the trial court and before this court is whether that raised a risk that the jury hearing that would be more likely to convict him because he's a bad person rather than because of the charged offenses. And I think the risk, especially when we're talking about now defendant's confession, is just too high to allow that, to find out if there's a fair trial after that. So for those reasons, Your Honor, we ask that you reverse two or at least one of these positions in between the entire case and the trial. Thank you, Counsel.